J-S78010-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JEFFREY CEPEDA | |
| Appellant | No. 821 MDA 2014 |

Appeal from the PCRA Order April 23, 2014
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0001759-2005

BEFORE: GANTMAN, P.J., JENKINS, J., and MUSMANNO, J.

MEMORANDUM BY GANTMAN, P.J.:          **FILED FEBRUARY 19, 2015**

Appellant, Jeffrey Cepeda, appeals from the order entered in the Berks County Court of Common Pleas, which dismissed his first petition brought pursuant to the Post Conviction Relief Act ("PCRA").[1] We affirm.

The PCRA court's opinion sets forth the relevant facts and procedural history of this case as follows:

> Appellant was convicted of third degree murder and related charges in connection with the shooting death of 19-year-old Rene Castro, known by some witnesses as "Buzz" (…"Victim Rene Castro"), in the early morning hours of December 31, 2004. At trial, the Commonwealth presented multiple witnesses to the shooting, including Priscilla Rodriguez, Robert Cairnes, Crystal Talarico, Erica Nowotarski, Jared Hopgood, Amy Smith, and Omar Serrano. All of these witnesses saw the events of

_____

[1] 42 Pa.C.S.A. §§ 9541-9546.

December 31, 2004 unfold from various vantage points along Perkiomen Avenue in Reading, Berks County, Pennsylvania. They each testified to substantially the same facts: that Appellant and Victim Rene Castro were engaged in a verbal argument as they walked along Perkiomen Avenue, that Victim Rene Castro walked onto a porch, a physical altercation ensued between the men, and Appellant ultimately shot Victim Rene Castro three times. None of the witnesses characterized Victim Rene Castro as the aggressor in the argument, and no one saw a gun in his hand prior to the shooting. Several Commonwealth witnesses testified that they saw Appellant shoot Victim Rene Castro, and that eventually Victim Rene Castro produced a gun, but by that time Appellant was already running away.

Commonwealth witness Priscilla Rodriguez testified that, in the very early morning hours of December 31, 2004, the sounds of an argument in the street caught her attention. Upon looking out her window, she recognized a man she knew as "Buzz" (Victim Rene Castro), and saw Appellant shoving Victim Rene Castro as the two men walked on Perkiomen Avenue toward 17th Street. She further testified that Appellant "pushed (Victim Rene Castro) in his face" and then walked away, crossing the street. After a further exchange of words and gestures, however, Appellant ran back across the street and followed Victim Rene Castro onto the porch. She then heard the sound of punching, followed by three gun shots, fixed in rapid succession. She saw Appellant walk away, look back at Victim Rene Castro on the porch, and then run away from the scene.

Similarly, Commonwealth witness Jarod Hopgood, who did not personally know [Victim Rene Castro] but recognized him from the neighborhood, testified that he had been on the phone with Priscilla Rodriguez on December 31, 2004[,] and recalled her telling him that she heard an argument in front of her house on Perkiomen. Avenue. Hopgood lived on the same block as Ms. Rodriguez, and his first floor apartment faced the street. He went out onto his porch and watched the argument unfolding on the street. Mr. Hopgood also noticed two other people in the street or on the sidewalk, but it appeared to him that they

were not involved in the argument.  He testified:

> Well, I saw—I saw Rene (Victim Rene Castro).  He was standing there.  And someone was arguing with him.  And the person—Rene wasn't saying too much.  It was the other person who was yelling at him.

At some point, Victim Rene Castro threw his hands up and walked away, but the other person (later identified as Appellant) followed him, continuing to yell.  Appellant turned and began walking away from Victim Rene Castro, but then there was a yell and Appellant ran, specifically he sprinted, back towards the porch where Victim Rene Castro was then standing.  "When he started sprinting, I went into the house. I didn't—I got a bad feeling."  When Mr. Hopgood got inside, one of his friends reported that the men had begun to fight.  Wanting to watch the fight, he decided to return to his front porch.  Before he made it back outside, however, he heard gunshots.  He saw Appellant standing in front of Victim Rene Castro with his arm extended toward Mr. Castro, but did not see a gun.  Mr. Hopgood retreated to his apartment a second time, but at some point came back outside and saw Victim Rene Castro "slumped in the vestibule" of the house where the shooting had taken place.

Commonwealth witness Robert Cairnes, who was Jarod Hopgood's roommate at 1621 Perkiomen Avenue at the time of the shooting, testified that on December 31, 2004[,] while hanging out with friends at home, he heard an argument outside his apartment.  He walked over to a bay window facing Perkiomen Avenue, and looked out through the blinds.  He testified to seeing three men walking and arguing, coming from the direction of the A-Plus mini market towards his residence.  Mr. Cairnes moved to the vestibule in the front of the apartment building to watch.  He recognized "Buzz" (Victim Rene Castro), and saw that he was involved in an argument with two other men, who were yelling.  Mr. Cairnes testified that the argument was loud enough to be heard from inside his apartment.  It appeared to him that Appellant was arguing with Victim Rene Castro and that the third man was "just tagging along," not participating in the argument.  At some point, Mr. Cairnes saw Victim Rene

Castro cross the street to "Omar's house" (Commonwealth witness Omar Serrano), directly across from the witness' house. He saw Victim Rene Castro knock on the window of the house a few times, and then enter the building's front vestibule. Mr. Cairnes then saw Mr. Omar Serrano come out of the residence and stand with Victim Rene Castro. Mr. Cairnes did not see anything in either man's hands prior to the fight that ensued, and he did not see Victim Rene Castro hit Appellant at any time. He saw Victim Rene Castro reel backward after being hit by Appellant, and stated that Mr. Serrano was not a participant in the fight. After Victim Rene Castro was knocked back by Appellant's blows, Mr. Cairnes testified that he saw Appellant reach towards his waist, and then he heard shots. "I just seen him reach for his waist. And the next thing you know three gunshots are fired." He said the shots were fired while Victim Rene Castro was recovering from the blow to the head. Mr. Cairnes then saw Appellant turn and run down the street and noticed that the other people he had seen earlier were also running. Although Mr. Cairnes did not see anything in his hand prior to the shooting, he testified that, after being shot, Victim Rene Castro stumbled back into the vestibule or hallway, and when he reappeared he had a gun in his hand. By the time Victim Rene Castro re-emerged with the weapon, Appellant was already across the street and running away. On cross-examination, Mr. [Cairnes] reiterated that before [Victim Rene Castro] was shot, [Mr. Cairnes] did not see Victim Rene Castro reach for anything.

Commonwealth witness Crystal Talarico testified that on the night of the shooting, she had been at 1621 Perkiomen Avenue with Robert Cairnes, Erica Nowotarski, Eddie Schwambach, Jarod Hopgood and Phil Reifsnyder when she heard yelling "out front." The entire group went to the front porch, with the exception of Phil Reifsnyder who was already sleeping. She saw two people arguing, and also saw two other people who did not appear to be involved in the argument. Like the other witnesses, Crystal Talarico did not see a gun in anyone's hand prior to the shooting, however she did see Appellant extend his right arm, heard three shots, and simultaneously saw "some kind of light go off," which she further described as "like sparks."

- 4 -

Commonwealth witness Erica Nowotarski testified that she, too, heard arguing on December [31], 2004[,] outside the residence on Perkiomen Avenue, which prompted her to look outside where she saw "two guys in the street arguing." She also noted that there were other people on the street, and observed that Victim Rene Castro was wearing a fur-trimmed jacket. With respect to the argument, Ms. Nowotarski testified that it looked to her like Victim Rene Castro did not wish to argue, because, as she explained: "Rene was walking away from it. He didn't want anything to do with it." She saw Victim Rene Castro walk to a house and knock on the door, and then saw Appellant come up on the porch behind Victim Rene Castro and hit him in the head. Appellant hit Victim Rene Castro on the head as he was walking away. She never saw Victim Rene Castro punch Appellant. Ms. [Nowotarski] then testified that she saw Appellant pull out his gun, hold it out towards Victim Rene Castro, and then she heard three shots.

Commonwealth witness Amy Smith, who lived on the sixteen hundred block of Perkiomen Avenue at the time of the shooting, testified that at 12:49 a.m. on December 31, 2004[,] she was watching TV in her first-floor living room when she heard arguing. She looked outside and saw two men engaged in an argument, one of which was bald and the other of which was wearing a coat with fur around the hood. She testified that although both men were arguing, the bald one was doing "more yelling." Ms. Smith did not see anything in either of the men's hands. She indicated that the man with the fur-trimmed hood started walking away first, and that the bald man followed him. The men then walked out of her view, and, after approximately ten or fifteen minutes, she heard gunshots and called 911.

Commonwealth witness Omar Serrano testified that on December 31, 2004[,] he was residing at 1622 Perkiomen Avenue in the City of Reading, and that in the early morning hours of that day he was watching television in the living room when he heard a knock at his window. He went to the window to see who it was and recognized…Victim Rene Castro. Mr. Serrano opened the front door and saw Victim Rene Castro and another individual arguing on the front porch. He identified that

other person as Appellant. Mr. Serrano testified that Appellant began to hit Victim Rene Castro on the head, punching him with both hands while Victim Rene Castro attempted to shield himself from the blows. Mr. Serrano testified that he could see Victim Rene Castro's hands, and that there was nothing in them. Mr. Serrano testified that he intervened in the fight, and that Appellant went to the steps while Victim Rene Castro remained on the porch with him. When asked what happened next, he stated, Appellant "pulled out a gun and shoot him." He elaborated a bit, saying that Appellant had pulled a gun from his waist, pointed it at Victim Rene Castro, and shot him. He also testified definitively that Victim Rene Castro did not have a gun in his hands at the time he was shot. Mr. Serrano then ran inside the building to his apartment, and, after a few minutes, called 911.

(PCRA Court Opinion, filed July 28, 2014, at 2-8) (internal citations to record omitted). A jury convicted Appellant on April 20, 2006, of third-degree murder, two counts of aggravated assault, firearms not to be carried without a license, and two counts of possessing instruments of crime. The court sentenced Appellant on June 23, 2006, to an aggregate term of fifteen (15) to thirty (30) years' imprisonment. Appellant did not file any post-sentence motions or a direct appeal.

The PCRA court's opinion further summarized:

On November 30, 2006[,] Appellant filed a *pro se* [PCRA] petition seeking restoration of his appellate rights, which [the PCRA court] granted on July 14, 2008. Thereafter Appellant filed a direct appeal *nunc pro tunc*. On August 9, 2009[,] Appellant's appeal was quashed as untimely, and he was directed to file a PCRA petition to restore his direct appeal rights. Accordingly, on October 8, 2009, Appellant filed a second PCRA petition, which [the PCRA court] granted and Appellant again appealed to the Superior Court. His judgment of sentence was affirmed on January 12, 2011[,] and the Pennsylvania Supreme Court denied

- 6 -

Appellant's Petition for Allowance of Appeal on August 30, 2011. On August 17, 2013, Appellant filed another *pro se*, check-the-box motion for post conviction collateral relief. [The PCRA court] appointed PCRA counsel…to represent Appellant in the disposition of his PCRA claims. After exhaustively reviewing the record and finding no issues of merit, PCRA counsel filed a "No Merit" Letter pursuant to **Commonwealth v. Finley**, 550 A.2d 213 (Pa.Super. 1988) and **Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988). …

(PCRA Court Opinion at 1-2). On February 24, 2014, the PCRA court granted counsel's motion to withdraw, and issued notice of its intent to dismiss Appellant's petition without a hearing pursuant to Pa.R.Crim.P. 907. Appellant filed a *pro se* response on March 19, 2014. The PCRA court subsequently denied Appellant's petition on April 23, 2014. Appellant timely filed a *pro se* notice of appeal on May 12, 2014. The PCRA court ordered Appellant on May 21, 2014, to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Appellant timely complied *pro se* on June 4, 2014.

Appellant raises the following issues for our review:

WHETHER THE TRIAL COURT COMMITTED PLAIN ERROR, WHICH WAS STRUCTURAL IN NATURE, WHEN IT INSTRUCTED THE JURY IN SUCH A WAY THAT THE COMMONWEALTH WAS PERMITTED TO OBTAIN A THIRD DEGREE MURDER CONVICTION BY PROVING THE ELEMENTS OF UNREASONABLE BELIEF SELF-DEFENSE, WHICH IS CLEARLY, AND STATUTORILY, ONLY VOLUNTARY MANSLAUGHTER?

WHETHER TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE WHEN [COUNSEL] FAILED TO OBJECT TO THE TRIAL COURT'S ERRONEOUS AND MISLEADING JURY INSTRUCTIONS WITH REGARD TO THIRD DEGREE

- 7 -

MURDER AND VOLUNTARY MANSLAUGHTER?

WHETHER APPOINTED PCRA COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO HAVE ANY CONTACT WITH HIS CLIENT, INCLUDING NOT RESPONDING TO CORRESPONDENCE, BY FAILING TO FILE A PROPER "NO MERIT" LETTER WHEN COUNSEL MERELY REVIEWED THE *PRO SE* PCRA PETITION AND DID NOT CONDUCT A COMPLETE REVIEW OF THE TRIAL RECORD, AND BY COMPLETELY IGNORING THE PURPOSE OF PCRA REVIEW?

(Appellant's Brief at 4).

Our standard of review of the denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error. **Commonwealth v. Conway**, 14 A.3d 101 (Pa.Super. 2011), *appeal denied*, 612 Pa. 687, 29 A.3d 795 (2011). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. **Commonwealth v. Boyd**, 923 A.2d 513 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). We give no such deference, however, to the court's legal conclusions. **Commonwealth v. Ford**, 44 A.3d 1190, 1194 (Pa.Super. 2012). Further, a petitioner is not entitled to a PCRA hearing as a matter of right; the PCRA court can decline to hold a hearing if there is no genuine issue concerning any material fact, the petitioner is not entitled to PCRA relief, and no purpose would be served by any further proceedings. **Commonwealth v. Wah**, 42 A.3d 335, 338 (Pa.Super. 2012).

In his first and second issues combined, Appellant argues trial counsel was ineffective for failing to object to the trial court's jury instruction. Specifically, Appellant alleges the following jury instructions were in error:

> [T]here can be no malice when certain reducing circumstances are present. When these circumstances are present, a killing may be voluntary manslaughter but not murder. This is true, for example, when a defendant kills in the heat of passion following serious provocation or when [a] defendant kills a person under the unreasonable mistaken belief in justifying circumstances; in other words, that a defendant killed a person under an unreasonable mistaken belief that he had the right to use self-defense.
>
> Accordingly, you can find…malice and find [Appellant] guilty of murder only if you are satisfied beyond a reasonable doubt that [Appellant] was not acting under a sudden and intense passion resulting from serious provocation by the victim **or that he was acting under an unreasonable belief** that the circumstances were such that if they existed would have justified the killing.

(N.T. Trial, 4/17/06-4/20/06, at 613-14) (emphasis added). Appellant claims the jury instructions, when read as a whole, were misleading and caused the jury to find Appellant guilty of third-degree murder rather than voluntary manslaughter. Appellant avers the jury misinterpreted the court's instructions, and there is a substantial possibility the jury rested Appellant's third-degree murder conviction on the court's misleading instructions. Appellant affirms neither defense counsel objected to the erroneous jury instructions, which led to Appellant's conviction for third degree murder, and a more severe sentence than would have otherwise been imposed. Appellant also asserts trial counsel could not have had any rational, strategic

basis for failing to object to the jury instructions. Appellant insists a timely objection would have permitted the court to correct or clarify the jury charge. Appellant maintains there is a reasonable probability that, but for trial counsels' failure to object, the jury would have returned a guilty verdict for voluntary manslaughter rather than third-degree murder. Appellant concludes this Court should reverse the PCRA court's order and remand for further proceedings, or, in the alternative, vacate Appellant's conviction for third-degree murder and grant him a new trial. We disagree.

The law presumes counsel has rendered effective assistance. ***Commonwealth v. Williams***, 597 Pa. 109, 950 A.2d 294 (2008). When asserting a claim of ineffective assistance of counsel, the petitioner is required to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and, (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. ***Commonwealth v. Kimball***, 555 Pa. 299, 724 A.2d 326 (1999). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. ***Williams, supra***.

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit…." ***Commonwealth v. Pierce***, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994). "Counsel cannot

- 10 -

be found ineffective for failing to pursue a baseless or meritless claim."

***Commonwealth v. Poplawski***, 852 A.2d 323, 327 (Pa.Super. 2004).

> Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests. If we conclude that the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective.

***Pierce, supra*** at 524, 645 A.2d at 194-95 (internal citations omitted).

> Prejudice is established when [an appellant] demonstrates that counsel's chosen course of action had an adverse effect on the outcome of the proceedings. The [appellant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In [***Kimball, supra***], we held that a "criminal [appellant] alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

***Commonwealth v. Chambers***, 570 Pa. 3, 21-22, 807 A.2d 872, 883 (2002) (some internal citations and quotation marks omitted).

"[T]o succeed on an allegation of…counsel's ineffectiveness…a post-conviction petitioner must, at a minimum, present argumentation relative to each layer of ineffective assistance, on all three prongs of the ineffectiveness standard…." ***Commonwealth v. D'Amato***, 579 Pa. 490, 500, 856 A.2d 806, 812 (2004) (internal citations omitted). "[A] petitioner does not preserve a…claim of ineffectiveness merely by focusing his attention on whether…counsel was ineffective. Rather, the petitioner must also present argument as to how the second and third prongs of the ***Pierce*** test are met

with regard to the…claim." ***Commonwealth v. Santiago***, 579 Pa. 46, 69, 855 A.2d 682, 696 (2004). "[A]n undeveloped argument, which fails to meaningfully discuss and apply the standard governing the review of ineffectiveness claims, simply does not satisfy [the petitioner's] burden of establishing that he is entitled to any relief." ***Commonwealth v. Bracey***, 568 Pa. 264, 273 n.4, 795 A.2d 935, 940 n.4 (2001).

A jury charge is erroneous only if the charge as a whole is inadequate, unclear, or has a tendency to mislead or confuse, rather than clarify, a material issue. ***Commonwealth v. Baker***, 963 A.2d 495, 507 (Pa.Super. 2008), *appeal denied*, 606 Pa. 644, 992 A.2d 885 (2010) (citation omitted).

> A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions.

***Id.***

> The trial court may use its own form of expression to explain difficult legal concepts to the jury, as long as the trial court's instruction accurately conveys the law. A verdict will not be set aside if the instructions of the trial court, taken as a whole, and in context, accurately set forth the applicable law.

***Commonwealth v. Jones***, 858 A.2d 1198, 1201 (Pa.Super. 2004). "Error cannot be predicated on isolated excerpts of the charge…it is the general effect of the charge that controls." ***Id.*** (quoting ***Commonwealth v. Pursell***, 555 Pa. 233, 724 A.2d 293, 314 (1999) (quotation marks omitted). When viewed in its entirety, an isolated misstatement is insignificant where

it fails to prejudice the appellant, and the charge is otherwise free of errors. *See Commonwealth v. Mickens*, 597 A.2d 1196, 1204-05 (Pa.Super. 1991). Therefore, under these circumstances, an appellant is not entitled to a new trial. *See id.* at 1205.

Instantly, the trial court instructed the jury on the elements of third-degree murder, including the necessity of proof beyond a reasonable doubt that Appellant committed the killing with malice. (*See* N.T. Trial, 4/17/06-4/20/06, at 611-12.) The court also summarized the distinctions between murder and manslaughter:

> Murder requires malice. Manslaughter does not.
>
> First degree murder requires the specific intent to kill. Third degree murder is any other murder.
>
> Voluntary manslaughter is basically an intentional killing from which malice is not proven because of passion and provocation or because [a] defendant had an unreasonable mistaken belief in justifying circumstances such as an unreasonable mistaken belief in self-defense.

*Id.* at 618. When read in context, the court's instructions as a whole clearly conveyed only murder requires malice, but voluntary manslaughter does not. *See Baker, supra*. One alleged misstatement in thirty-six pages of jury instructions did not mislead the jury or prejudice Appellant. *See id.*; *Mickens, supra*. Therefore, we are unable to conclude the court's jury instructions constitute reversible error. Accordingly, Appellant's ineffectiveness claim lacks arguable merit. *See Pierce, supra*.

With regard to Appellant's third issue, claiming ineffectiveness of PCRA

counsel, after a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable James M. Bucci, we conclude Appellant's third issue merits no relief. The PCRA court opinion comprehensively discusses and properly disposes of the question presented. (*See* PCRA Court Opinion at 9) (finding: Appellant failed to prove any of three prongs for ineffective assistance of counsel claims; Appellant was unable to demonstrate prejudice because he failed to prove that, but for PCRA counsel's acts or omissions, outcome of PCRA petition would have been different; PCRA counsel followed requirements of PCRA and accompanying law in filing of "No Merit" letter).[2] The record supports the PCRA court's decision; therefore, we see no reason to disturb it. As for Appellant's third issue, we affirm on the basis of the PCRA court's opinion. Accordingly, we affirm the PCRA court's order dismissing Appellant's petition.

_____

[2] We note two citation matters in the PCRA court's opinion at page 9. First, the correct citation for the *Pierce* case is *Commonwealth v. Pierce*, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994). Second, *Commonwealth v. Rios*, 920 A.2d 790, 799 (Pa. 2007) was overruled on other grounds; however, the proposition cited is still good law.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/19/2015

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: BERKS COUNTY, PENNSYLVANIA
: CRIMINAL DIVISION
v. :
: CP-06-CR-0001759-2005
:
JEFFREY CEPEDA : Assigned to: Judge James M. Bucci

Alisa Hobart, Esquire,
     Attorney for the Commonwealth

Jeffrey Cepeda,
     Defendant, *pro se*

July 21, 2014            Memorandum Opinion            J. Bucci, J.

## PROCEDURAL HISTORY

The defendant, Jeffrey Cepeda ("Appellant"), was convicted by a jury of third degree murder, two counts of aggravated assault, firearms not to be carried without a license, and possessing the instrument of a crime. He was sentenced to a total period of incarceration of 15 to 30 years in a state correctional facility.

On November 30, 2006 Appellant filed a *pro se* Post Conviction Relief Act ("PCRA") petition seeking restoration of his appellate rights, which we granted on July 14, 2008. Thereafter Appellant filed a direct appeal *nunc pro tunc*. On August 9, 2009 Appellant's appeal was quashed as untimely, and he was directed to file a PCRA petition to restore his direct appeal rights. Accordingly, on October 8, 2009, Appellant filed a second PCRA petition, which we granted and Appellant again appealed to the Superior Court. His judgment of sentence was affirmed on January 12, 2011 and the Pennsylvania Supreme Court denied Appellant's Petition

1

for Allowance of Appeal on August 30, 2011. On August 17, 2013, Appellant filed another *pro se*, check-the-box motion for post conviction collateral relief. We appointed PCRA counsel, Osmer Deming, Esquire, to represent Appellant in the disposition of his PCRA claims. After exhaustively reviewing the record and finding no issues of merit, PCRA counsel filed a "No Merit" Letter pursuant to Commonwealth v. Finley, 550 A.2d 213 (Pa. Super. 1988) and Commonwealth v. Turner, 544 A.2d 927 (Pa. 1988). Following an independent review of the record, we agreed that Appellant was not entitled to post-conviction relief under the PCRA. Accordingly, we dismissed his PCRA petition and the present appeal followed.

## FACTUAL BACKGROUND

Appellant was convicted of third degree murder and related charges in connection with the shooting death of 19-year-old Rene Castro , known by some witnesses as "Buzz" (hereinafter referred to as "Victim Rene Castro"), in the early morning hours of December 31, 2004. At trial, the Commonwealth presented multiple witnesses to the shooting, including Priscilla Rodriguez, Robert Cairnes, Crystal Talarico, Erica Nowotarski, Jared Hopgood, Amy Smith, and Omar Serrano. All of these witnesses saw the events of December 31, 2004 unfold from various vantage points along Perkiomen Avenue in Reading, Berks County, Pennsylvania. They each testified to substantially the same facts: that Appellant and Victim Rene Castro were engaged in a verbal argument as they walked along Perkiomen Avenue, that Victim Rene Castro walked onto a porch, a physical altercation ensued between the men, and Appellant ultimately shot Victim Rene Castro three times. None of the witnesses characterized Victim Rene Castro as the aggressor in the argument, and no one saw a gun in his hand prior to the shooting. Several Commonwealth witnesses testified that they saw Appellant shoot Victim Rene Castro, and that

2

eventually Victim Rene Castro produced a gun, but by that time Appellant was already running away.

Commonwealth witness Priscilla Rodriguez testified that, in the very early morning hours of December 31, 2004, the sounds of an argument in the street caught her attention. *See Notes of Testimony, Jury Trial, April 17, 2006 to April 20, 2006, (hereinafter NT, Jury Trial, 4/17/06-4/20/06) at 139-141.* Upon looking out her window, she recognized a man she knew as "Buzz" (Victim Rene Castro), and saw Appellant shoving Victim Rene Castro as the two men walked on Perkiomen Avenue toward 17th Street. *See NT, Jury Trial, 4/17/06-4/20/06, at p. 142-43.* She further testified that Appellant "pushed (Victim Rene Castro) in his face" and then walked away, crossing the street. *Id. at 148.* After a further exchange of words and gestures, however, Appellant ran back across the street and followed Victim Rene Castro onto the porch. *See id. at 151.* She then heard the sound of punching, followed by three gun shots, fired in rapid succession. *See id. at 152-53.* She saw Appellant walk away, look back at Victim Rene Castro on the porch, and then run away from the scene. *See id. at 153.*

Similarly, Commonwealth witness Jarod Hopgood, who did not personally know the victim but recognized him from the neighborhood, testified that he had been on the phone with Priscilla Rodriguez on December 31, 2004 and recalled her telling him that she heard an argument in front of her house on Perkiomen Avenue. *See id. at 171.* Mr. Hopgood lived on the same block as Ms. Rodriguez, and his first floor apartment faced the street. *See id. at 169.* He went out onto his porch and watched the argument unfolding on the street. *See id. at 171.* Mr. Hopgood also noticed two other people in the street or on the sidewalk, but it appeared to him

3

that they were not involved in the argument. *See id. at 172.* He testified:

> Well, I saw – I saw Rene (Victim Rene Castro). He was standing there. And someone was arguing with him. And the person – Rene wasn't saying too much. It was the other person who was yelling at him.

*Id. at 173-74.* At some point, Victim Rene Castro threw his hands up and walked away, but the other person (later identified as Appellant) followed him, continuing to yell. *See id. at 175-76.* Appellant turned and began walking away from Victim Rene Castro, but then there was a yell and Appellant ran, specifically he sprinted, back towards the porch where Victim Rene Castro was then standing. *See id. at 179.* "When he started sprinting, I went into the house. I didn't – I got a bad feeling." *Id.* When Mr. Hopgood got inside, one of his friends reported that the men had begun to fight. *See id. at 180.* Wanting to watch the fight, he decided to return to his front porch. *Id.* Before he made it back outside, however, he heard gunshots. *See id. at 181-82.* He saw Appellant standing in front of Victim Rene Castro with his arm extended toward Mr. Castro, but did not see a gun. *See id. at 182-83.* Mr. Hopgood retreated to his apartment a second time, but at some point came back outside and saw Victim Rene Castro "slumped in the vestibule" of the house where the shooting had taken place. *Id. at 184.*

Commonwealth witness Robert Cairnes, who was Jarod Hopgood's roommate at 1621 Perkiomen Avenue at the time of the shooting, testified that on December 31, 2004 while hanging out with friends at home, he heard an argument outside his apartment. *NT, Jury Trial, 4/17/06-4/20/06, p. 208.* He walked over to a bay window facing Perkiomen Avenue, and looked out through the blinds. *See id. at 209.* He testified to seeing three men walking and arguing, coming from the direction of the A-Plus mini market towards his residence. *See id. at 210.* Mr. Cairnes moved to the vestibule in the front of the apartment building to watch. *See id.*

4

*at 210-11.* He recognized "Buzz" (Victim Rene Castro), and saw that he was involved in an argument with two other men, who were yelling. *See id. at 210-11.* Mr. Cairnes testified that the argument was loud enough to be heard from inside his apartment. *See id. at 213.* It appeared to him that Appellant was arguing with Victim Rene Castro and that the third man was "just tagging along", not participating in the argument. *Id. at 213.* At some point, Mr. Cairnes saw Victim Rene Castro cross the street to "Omar's house" (Commonwealth witness Omar Serrano), directly across from the witness' house. *Id. at 214.* He saw Victim Rene Castro knock on the window of the house a few times, and then enter the building's front vestibule. *See id. at 215-16.* Mr. Cairnes then saw Mr. Omar Serrano come out of the residence and stand with Victim Rene Castro. *See id. at 216.* Mr. Cairnes did not see anything in either man's hands prior to the fight that ensued, and he did not see Victim Rene Castro hit Appellant at any time. *See id. at 217-18.* He saw Victim Rene Castro reel backward after being hit by Appellant, and stated that Mr. Serrano was not a participant in the fight. *See id. at 218-19.* After Victim Rene Castro was knocked back by Appellant's blows, Mr. Cairnes testified that he saw Appellant reach towards his waist, and then he heard shots. *See id. at 219.* "I just seen him reach for his waist. And the next thing you know three gunshots are fired." *Id. at 220.* He said the shots were fired while Victim Rene Castro was recovering from the blow to the head. *See id. at p. 220.* Mr. Carines then saw Appellant turn and run down the street, and noticed that the other people he had seen earlier were also running. *See id. at 221-22.* Although Mr. Cairnes did not see anything in his hand prior to the shooting, he testified that, after being shot, Victim Rene Castro stumbled back into the vestibule or hallway, and when he reappeared he had a gun in his hand. *See id. at 223.* By the time Victim Rene Castro re-emerged with the weapon, Appellant was already across the street and running away. *See id.* On cross-examination, Mr. Carines reiterated that before he

5

was shot, he did not see Victim Rene Castro reach for anything. *See id. at 233.*

Commonwealth witness Crystal Talarico testified that on the night of the shooting, she had been at 1621 Perkiomen Avenue with Robert Cairnes, Erica Nowotarski, Eddie Schwambach, Jarod Hopgood and Phil Reifsnyder when she heard yelling "out front". *NT, Jury Trial, 4/17/06-4/20/06, at 239-240.* The entire group went to the front porch, with the exception of Phil Reifsnyder who was already sleeping. *Id.* She saw two people arguing, and also saw two other people who did not appear to be involved in the argument. *See id. at 242.* Like the other witnesses, Crystal Talarico did not see a gun in anyone's hand prior to the shooting, however she did see Appellant extend his right arm, heard three shots, and simultaneously saw "some kind of light go off", which she further described as "like sparks". *Id. at 248.*

Commonwealth witness Erica Nowotarski testified that she, too, heard arguing on December 21, 2004 outside the residence on Perkiomen Avenue, which prompted her to look outside where she saw "two guys in the street arguing." *NT, Jury Trial, 4/17/06-4/20/06 at. 266.* She also noted that there were other people on the street, and observed that Victim Rene Castro was wearing a fur-trimmed jacket. *See id. at 268.* With respect to the argument, Ms. Nowotarski testified that it looked to her like Victim Rene Castro did not wish to argue, because, as she explained: "Rene was walking away from it. He didn't want anything to do with it." *Id. at 269-70.* She saw Victim Rene Castro walk to a house and knock on the door, and then saw Appellant come up on the porch behind Victim Rene Castro and hit him in the head. *See id. at 270-71.* Appellant hit Victim Rene Castro on the head as he was walking away. *See id. at 276.* She never saw Victim Rene Castro punch Appellant. *See id. at 278.* Ms. Notowarski then

6

testified that she saw Appellant pull out his gun, hold it out towards Victim Rene Castro, and then she heard three shots. *See id. at pp. 272-74.*

Commonwealth witness Amy Smith, who lived on the sixteen hundred block of Perkiomen Avenue at the time of the shooting, testified that at 12:49 a.m. on December 31, 2004 she was watching TV in her first-floor living room when she heard arguing. *NT, Jury Trial, 4/17/06-4/20/06 at 331-32.* She looked outside and saw two men engaged in an argument, one of which was bald and the other of which was wearing a coat with fur around the hood. *See id. at 333-34.* She testified that although both men were arguing, the bald one was doing "more yelling". *Id. at 336.* Ms. Smith did not see anything in either of the men's hands. *Id.* She indicated that the man with the fur-trimmed hood started walking away first, and that the bald man followed him. *See id. at 337.* The men then walked out of her view, and, after approximately ten or fifteen minutes, she heard gunshots and called 911. *See id. at 337-38.*

Commonwealth witness Omar Serrano testified that on December 31, 2004 he was residing at 1622 Perkiomen Avenue in the City of Reading, and that in the early morning hours of that day he was watching television in the living room when he heard a knock at his window. *See NT, Jury Trial, 4/17/06-4/20/06 at 359-61.* He went to the window to see who it was and recognized the victim, Victim Rene Castro. *See id. at 361.* Mr. Serrano opened the front door and saw Victim Rene Castro and another individual arguing on the front porch. *See id. at 362.* He identified that other person as Appellant. *See id. at 363.* Mr. Serrano testified that Appellant began to hit Victim Rene Castro on the head, punching him with both hands while Victim Rene Castro attempted to shield himself from the blows. *See id. at 364-66.* Mr. Serrano testified that

7

Circulated 02/06/2015 10:44 AM

he could see Victim Rene Castro's hands, and that there was nothing in them. *See id. at 364-366.* Mr. Serrano testified that he intervened in the fight, and that Appellant went to the steps while Victim Rene Castro remained on the porch with him. *See id. at 366-367.* When asked what happened next, he stated, Appellant "pulled out a gun and shoot him". *Id. at 367.* He elaborated a bit, saying that Appellant had pulled a gun from his waist, pointed it at Victim Rene Castro, and shot him. *See id. at 367-369.* He also testified definitively that Victim Rene Castro did not have a gun in his hands at the time he was shot. *See id. at 369.* Mr. Serrano then ran inside the building to his apartment, and, after a few minutes, called 911. *See id. at 370.*

## ISSUES RAISED ON APPEAL

1. PCRA counsel Osmer Deming was ineffective in his representation of Appellant in the disposition of his PCRA Petition;

2. Trial counsel was ineffective in his representation of Appellant for failing to object to the jury instructions relating to third degree murder and manslaughter;

3. The court erred at trial by giving incorrect jury instructions with respect to third degree murder and manslaughter; and

4. The court erred by failing to conduct an evidentiary hearing on Appellant's PCRA petition.

## DISCUSSION

Appellant is appealing the dismissal of his PCRA petition. He first contends that his court-appointed PCRA counsel, Osmer Deming, Esquire, was ineffective in his representation of Appellant by:

> misstating the waiver standard with regard to issues raised in the pro se PCRA petition; refusing to have any contact, including responding to correspondence from petitioner, with his client; not filing a proper "no merit" letter where there was no indication that counsel's review of the record revealed no other issues that may be cognizable on PCRA review, his only focus being on the claims raised in the pro se petition; and, counsel misled the court as to the

8

[t]he trial court committed plain error, structural in nature, when it instructed the jury such that the Commonwealth was permitted to obtain a third degree murder conviction by proving the elements of unreasonable belief self-defense, which is clearly and statutorily only voluntarily manslaughter.

The jury instructions are reproduced in their entirety as part of the Notes of Testimony. *See NT, Jury Trial, 4/17/06-4/20/06, pp. 603-652.* In our Notice of Intent to Dismiss, we summarized the pertinent portions of the jury instructions at issue. This court instructed the jury as follows with respect to malice, third degree murder, and voluntary manslaughter:

Now, before defining each of these crimes I will tell you about malice which is an element of murder but is not an element of manslaughter. That's what differentiates murder from manslaughter, the concept of malice.

A person who kills must act with malice to be guilty of any degree of murder whether first or third degree murder. The word malice as I am using it has a special legal meaning. It doesn't mean simply hatred, spite, or ill will. Malice is a shorthand way of referring to any three different mental states that the law regards as being bad enough to make a killing a murder.

The type of malice differs for each degree of murder. Thus, for murder of the first degree a killing is with malice if the perpretrator acts with, first, an intent to kill or as we'll explain later, the definition – or as I will explain later in my definition of first degree murder, the killing is willful, deliberate, and premeditated.

Now for murder of the third degree a killing is with malice if the perpetrator's actions show his wanted (*sic)* and willful disregard of an unjustified and extremely high risk that his conduct would result in death or serious bodily injury. In this form of malice the Commonwealth need not prove that the perpetrator specifically intended to kill the other person.

The Commonwealth must prove, however, that he took action while consciously; that is, knowingly disregarding the most serious risk he was creating and that by his disregard of that risk he demonstrated his own extreme indifference to the value of human

10

life.

Now, a killing is likewise without malice if the perpetrator acts with lawful justification or excuse. Lawful justification or excuse not only negates malice but also is a complete defense to any charge of criminal homicide whether it's murder or manslaughter. I shall say more about this when I charge you on the defense of self-defense.

So again, as a way of introduction the difference between murder and manslaughter is the necessary element of malice. In order to find the defendant guilty of either first degree murder or third degree murder, you must be satisfied beyond a reasonable doubt that the Commonwealth – that the Commonwealth has proved malice. Malice is not an element of manslaughter.

*NT, Jury Trial, 4/17/06-4/20/06, at 607-609.* We then went on to charge the jury with respect to

third degree murder and manslaughter:

Third degree murder is any killing with malice that is not first degree murder. The defendant has been charged with third degree murder. And to find the defendant guilty of this offense you must find that the following three elements have been proven beyond a reasonable doubt: First that Rene Castro, II, is dead; second, that the defendant killed him; and third, that the defendant did so with malice.

Again, the word malice has special meaning. It does not mean simply hatred, spite, or ill will. Malice is a shorthand way of referring to a particular mental state that the law regards as being bad enough to make a killing a murder rather than reducing it to manslaughter...

On the other hand, a killing is without malice if the perpetrator acts with lawful justification or excuse such as self defense or under circumstance, other circumstances that reduce the killing to voluntary manslaughter. And, again, I will explain those other circumstances that reduce a killing to manslaughter when I give you the definition of manslaughter. ...

When deciding whether the defendant acted with malice you should consider all of the evidence including his words, conduct, and the attending circumstances that show his state of mind. If you believe that the defendant intentionally used a deadly weapon on a

11

vital part of the victim's body you may regard that as an item of circumstantial evidence from which you may choose to *(sic)* that that defendant acted with malice.

So, again, you may find the defendant guilty of third degree murder if you are satisfied beyond a reasonable doubt that Rene Castro, II, is dead; second, that the defendant killed him; and, third, that the defendant did so with malice.

If you are not satisfied that all three elements have been proven beyond a reasonable doubt you must find the defendant not guilty of third degree murder.

Now, let me turn to voluntary manslaughter. As my earlier definition of malice indicates, there can be no malice when certain reducing circumstances are present. When these circumstances are present, a killing may only be voluntary manslaughter but not murder. This is true, for example, when a defendant kills in the heat of passion following serious provocation or when the defendant kills a person *under the unreasonable mistaken belief in justifying circumstances*; in other words, that a defendant killed a person under an unreasonable mistaken belief that he had the right to use self-defense.

Accordingly, you can find malice and murder - - accordingly you can find malice and find the defendant guilty of murder *only if you are satisfied beyond a reasonable doubt that the defendant was not acting under a sudden and intense passion resulting from serious provocation by the victim or that he was acting under an unreasonable belief that the circumstances were such that if they existed would have justified the killing.*

*NT, Jury Trial, 4/17/06-4/20/06, at 611-614 (emphasis added).* As set forth in our Notice of Intent to Dismiss, contrary to Appellant's assertions, we did not instruct the jury that they could find Appellant guilty of third degree murder where the evidence showed that Appellant held an unreasonable belief that self-defense was justified. The jury instructions address unreasonable self-defense, and clearly state that, where there is a belief that self defense is justified, even where that belief is unreasonable, this would negate a finding of malice necessary to support a conviction for murder of any degree.

12

Because the jury instructions given at trial accurately distinguished between third degree murder and voluntary manslaughter, we found that Appellant had failed to raise a cognizable claim with respect to the jury instructions. Further, the evidence presented by the Commonwealth clearly supported Appellant's conviction for third degree murder, as previously affirmed by the Superior Court.[1]

With respect to Appellant's related claim, that trial counsel was ineffective for failing to object to the jury instructions pertaining to third degree murder discussed above, we submit that trial counsel could not be ineffective for failing to object to something that was not objectionable.

> When asserting ineffective assistance of counsel, (Petitioner) must demonstrate that (1) the underlying claim is of arguable merit; (2) the particular course chosen by counsel did not have any reasonable basis designed to effectuate his client's interests; and (3) counsel's ineffectiveness prejudiced (Petitioner).

Commonwealth v. Cook, 544 Pa. 361, 367, 676 A.2d 639, 647 (1996). This is a restatement of the well-established three-prong test set forth in Pierce, in which the Pennsylvania Supreme Court adopted the Strickland standard. See Commonwealth v. Pierce, 786 A.2d 203, 213 (Pa. 1987), *adopting* Strickland v. Washington, 466 U.S. 668, 687 (1984). As discussed in the preceding section, failure to establish any of the three prongs necessarily results in the dismissal of the claim. Commonwealth v. Basemore, 744 A.2d 717 (Pa. 1999).

---

[1] Superior Court Docket Number 1904 MDA 2009.

We dismissed Appellant's PCRA claims relating to the jury instructions because they were without any arguable merit. The instructions given were proper, and, therefore, trial counsel could not have been ineffective for failing to object to them. Because the claim for ineffectiveness is without arguable merit, we did not address the second two prongs of the test in our Notice of Intent to Dismiss. Because Appellant failed to show how trial counsel was ineffective for failing to object to the jury instructions, it follows that this court did not err in dismissing Appellant's PCRA petition on those grounds.

Lastly, Appellant contends that this court erred in failing to conduct an evidentiary hearing on the merits of his PCRA Petition. Pursuant to the Pennsylvania Rules of Criminal Procedure, if, after reviewing the petition and the record, the court determines that there are no "genuine issues of material fact and that the defendant is not entitled to post-conviction collateral relief" then no hearing is required. Pa.R.C.P. 907. There is no absolute right to a hearing under the PCRA. See Commonwealth v. Granberry, 644 A.2d 204 (Pa. Super.1994). We reviewed the entire record and considered Appellant's claims under the PCRA, and determined his claims were frivolous and did not entitle him to a hearing.

## CONCLUSION

Appellant appealed the dismissal of his PCRA Petition. Because we believe the dismissal of his PCRA Petition was proper, we respectfully request that his appeal be DENIED.

14

merits of the issues raised in the pro se petition.

With respect to PCRA counsel Deming's representation of Appellant, it is well established that under Pennsylvania jurisprudence counsel is presumed effective, and Appellant bears the burden of proving otherwise. See Commonwealth v. Hall, 701 A.2d 190, 200-01 (Pa. 1997). The test for ineffectiveness consists of three prongs: (1) the claim is of arguable merit; (2) counsel had no reasonable basis for his or her actions or inactions, and (3) actual prejudice resulted, in that the outcome of the proceedings would have been different but for the actions or inactions of counsel. See Commonwealth v. McGill, 832 A.2d 1014, 1020 (Pa. 2003) and Commonwealth v. Pierce, 786 A.2d 203, 213 (Pa. 1987), *adopting* Strickland v. Washington, 466 U.S. 668, 687 (1984). Failure to establish any of the three prongs necessarily results in the dismissal of the claim. Commonwealth v. Basemore, 744 A.2d 717 (Pa. 1999). To establish the prong of prejudice, Defendant must demonstrate that "but for the act or omission in question, the outcome of the proceedings would have been different". Commonwealth v. Rios, 920 A.2d 790, 799 (Pa. 2007). Appellant has not shown any of the three prongs, but specifically has not demonstrated prejudice, because he has not established that, but for PCRA Counsel's acts or omissions, the outcome would have been different. This court independently reviewed the record, and concurred with PCRA counsel that there were no issues of merit. PCRA counsel followed the edicts of the PCRA and the accompanying decisional law in filing his "No Merit" Letter, and Appellant has not demonstrated how his PCRA attorney was ineffective.

Appellant next contends that his trial counsel was ineffective for failing to object to the jury instructions on third degree murder, and he also argues that the court erred in giving said instructions. According to Appellant:

9